(134 App. Div. 523.)

BERNADAC v. SCHENCKE PIANO CO.

(Supreme Court, Appellate Division, First Department. November 19, 1909.)

MASTER AND SERVANT (§ 117*)—INJURIES TO SERVANT—NEGLIGENCE.

Where a master installed a freight elevator, constructed properly and with good materials, and had regular inspection made thereof, and it showed no defects, though it appeared that the fact that the elevator at times ran irregularly was not reported to the master, and after an accident by the falling of the elevator, conditions indicated that the cable had run off the drum, but there was nothing to show why or how it occurred, or that it could have been reasonably anticipated or discovered, or prevented by inspection prior to the accident, negligence of the master was not shown.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 117.*]

Appeal from Trial Term, New York County.

Action by Catherine M. Bernadac, administratrix of Frank Bernadac, against the Schencke Piano Company. From a judgment for plaintiff, and an order denying a new trial, defendant appeals. Reversed, and new trial ordered.

Argued before PATTERSON, P. J., and INGRAHAM, McLAUGHLIN, LAUGHLIN, and CLARKE, JJ.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Charles Melville Weeks, for appellant.

William McNulty (Edwin T. Taliaferro, of counsel), for respondent.

CLARKE, J.   The Schencke Piano Company occupied the two upper floors of a building situated on Rider avenue, in the borough of the Bronx, under a verbal lease with the owner of said building, Louis F. Schutte, who was the president of the company.   The defendant is an assembler and finisher of pianos, and claims that it had a contract with one Gleitz for the performance of one portion of its work on the first floor, and with Owen McCarren for another portion of its work located on the second floor, and that its only direct employé was a porter, who also ran the elevator.   Plaintiff's intestate was a piano stringer, and defendant claims that he was in the employ of Gleitz, and Gleitz testified to the same effect.

There was a freight elevator erected outside of the building, open except for a roof, with a platform about 5 by 6 feet, used to carry the heavy parts of the pianos to the upper story.   This had been constructed some 18 months before the accident by an elevator constructing company and had been in constant use.   The platform was hung from a ⅝-inch Swedish iron cable, which passed over a 2-foot pulley at the top of the elevator shaft, and thence down into the building to a drum 2 feet in diameter, attached to a single steel shaft, by which it was operated by a motor.   The elevator weighed about 500 pounds, and the cable had tensile strength sufficient to support from 11,000 to 12,000 pounds.   The guides were made of yellow pine, and there were safety clutches attached to the elevator, whose purpose it was to stop the fall of the elevator if the cable slackened or broke.   The workmen were accustomed, with the knowledge of the officers of the defendant, to use this elevator, and frequently ran it without the aid of the elevator man.   On the day of the accident Bernadac, the decedent, and McCarren went up on the elevator to the second floor, where McCarren got off.   Bernadac then pulled the rope to start the elevator down, when it fell to about 2 feet from the bottom of the shaft, where the safety clutches finally held it.   The force of the fall broke both of Bernadac's legs, and as a result of the injuries received he shortly thereafter died.

An examination showed that the cable had broken inside of the building a few feet from the drum, and that the end was twisted, flattened, kinked, and the wires stretched, showing that a part of the cable had run off the drum, and had become twisted around the small central steel shaft, and was there subject to a very considerable strain.   While such portions of the cable as ran in the open air were rusted upon the outside by the effects of the weather, the ends of the wire at the break, as testified to by all the witnesses who saw it at the time, were bright.   There is no proof of any defect in the wire cable having been found prior to the accident.   There is testimony that, shortly after the installation of the elevator, it was apt to stick fast, and that two weeks after its installation men came back and cut away some of the wooden guide rails to overcome this difficulty.   There is testimony that occasionally the elevator would stop or stick, and then fall a

little, and one witness testified that on the day of the accident, between 9 and 10 o'clock in the morning, he was riding up in the elevator from the ground floor; that, when it got about 15 feet up, it started to jump and fall; and that thereupon he jumped off onto the roof of an extension of the building. This witness also testified that, almost every time he rode on it, it would probably go up 3 feet and fall 1 foot.

It does not appear that the defendant company and its officers had been notified of these occurrences, and its officers and other witnesses testified that from the time the elevator was first put in nothing had happened in any way whatever which gave them any notice or any knowledge that there was anything the matter with the elevator, and that no one ever, at any time up to the time of the accident, reported that the elevator was out of gear in any way, shape, or manner; and it does appear that from time to time, and up to within two weeks of the accident, the elevator and its appliances were inspected by a representative of a casualty company, and nothing was discovered or reported to be out of order. There is no evidence in the case showing any defect in the cable, existing prior to the accident, that had been discovered or that could be discovered. On the contrary, the inspector who made an inspection two weeks before the accident testified:

"There was not the slightest defect in this rope, in all the inspections that I made, that was discoverable by the closest inspection, not the slightest; and the cable is there. There was not a defect in this cable that could have been discovered by any inspection; no, sir, by nobody."

A test was made of a piece of the cable after the accident, and it stood 11,000 pounds strain before it parted. A brand new cable of the same kind tested at 11,562 pounds. The weight on the cable at the time of the accident was the 500 pounds of the elevator and the 135 pounds of the decedent.

We have, then, a case presented of proper construction, of good materials, by a concern whose business it was to make elevators, regular inspection, with no defects discovered or discoverable, with some evidence of irregular running, never reported to the company, but with no evidence of any defect in the cable, and after the accident a condition indicating that the cable had run off the drum and had wound around the small shaft, with a break so close thereto as to indicate that that was the immediate cause of the accident, without any evidence to show why or how this occurred, that it could have been reasonably anticipated, or could have been discovered or prevented by inspection prior to the accident. It seems to me that this case fairly comes within the rule laid down by the Court of Appeals in Young v. Mason Stable Co., Ltd., 193 N. Y. 188, 86 N. E. 15, 127 Am. St. Rep. 939, 21 L. R. A. (N. S.) 592, where a freight elevator fell:

"In the case, however, of an appliance like this freight elevator, which may be regarded as an accessory to the general work of the establishment, and concerning the inspection and safety of which the master can ordinarily possess no special knowledge, I think that, so far as the persons in his service are concerned, he may rely upon a regular inspection thereof by experts in elevator construction, assuming, of course, that it was originally safe and adequate, and that he promptly make such repairs and alterations as such experts might suggest. * * * I think that the only possible basis for any charge of negligence against the master is the failure properly to inspect, and

that upon the uncontradicted evidence the master's duty in this respect was fully discharged by the inspection which was provided. * * * "

So in the case at bar it seems to me that the plaintiff has not sustained the burden of establishing the negligence of the defendant, and that the judgment and order appealed from should be reversed, and a new trial ordered, with costs and disbursements to abide the event. All concur.